1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   THE CALIFORNIA SPORTFISHING                     No.  2:14-cv-01452-KJM-CKD
     PROTECTION ALLIANCE, a non-profit
12   corporation,

13                 Plaintiff,                         ORDER

14          v.

15   RIVER CITY WASTE RECYCLERS,
     LLC, a California Limited Liability
16   Company,

17                 Defendant.

18

19

20                  This is a civil enforcement action brought by plaintiff The California Sportfishing

21   Protection Alliance (CSPA) against defendant River City Waste Recyclers, LLC (River City),

22   alleging violations of the Federal Water Pollution Control Act, 42 U.S.C. §§ 1251–1387 ("the

23   Clean Water Act" or "the Act") at River City's three-acre metal recycling facility in Sacramento,

24   California (the Facility).  This case is before the court on CSPA's motion for partial summary

25   judgment of defendant's liability for violations of the Clean Water Act, including a determination

26   as a matter of law of the total number and days of violations under the Act.  ECF No. 26.  River

27   City opposes the motion, Opp'n, ECF No. 27, and the CSPA has replied, Reply, ECF No. 39.  On

28   January 29, 2016, the court held a hearing; Michael Lozeau and Rebecca Davis appeared for

                                                  1

1   CSPA, and Mark Pruner appeared for River City.  After the January 2016 hearing, the court

2   allowed River City to file supplemental briefing and CSPA a surreply, clarifying their respective

3   positions regarding the record.  River City filed its supplemental briefing on February 8, 2016,

4   Supp. Brief, ECF No. 50, and CSPA its surreply on February 11, 2016, Surreply, ECF No. 51.

5          As explained below, the court GRANTS in part and DENIES in part CSPA's

6   motion for partial summary judgment.

7   I.      EVIDENTIARY ISSUES

8          CSPA has filed twenty pages of objections to the evidence River City submitted in

9   opposition to partial summary judgment.  River City raises just as many in its response to CSPA's

10  statement of material facts.  "The court is mindful of the language in Ninth Circuit cases that

11  '[d]efects in evidence submitted in opposition to a motion for a summary judgment are waived

12  absent a motion to strike or other objections.'"  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d

13  1110, 1119 (E.D. Cal. 2006).  At the same time, this case is yet another example of "attorneys

14  routinely rais[ing] every objection imaginable without regard to whether [they] are necessary, or

15  even useful."  *Id.*

16         A.      Relevance and Foundation

17         Here, many of the parties' objections concern the relevance and foundation of

18  evidence offered.  "[O]bjections to evidence on the ground that it is irrelevant" are duplicative of

19  the summary judgment standard.  A court cannot rely on irrelevant facts in a motion for summary

20  judgment.  *See Powell v. Union Pac. R. Co.*, 864 F. Supp. 2d 949, 953 n.2 (E.D. Cal. 2012)

21  (citing *Burch*, 433 F. Supp. 2d at 1119) (emphasis omitted).  Accordingly, relevance objections

22  are overruled.  In terms of foundation, "documents which have not had a proper foundation laid to

23  authenticate them cannot support a motion for summary judgment."  *Beyene v. Coleman Sec.*

24  *Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988).  Nevertheless, "[o]n summary judgment,

25  evidence need not be in a form that is admissible at trial.  Accordingly, as long as a party submits

26  evidence, which, regardless of its form, may be admissible at trial, it may be considered on

27  summary judgment."  *Collins v. Mendoza–Powers*, No. 06-1608, 2009 WL 453060, at *5 n.4

28  (E.D. Cal. Feb. 23, 2009) (citations omitted).  In some instances, foundation may be apparent

1  from the face of a document, *see, e.g.*, *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th

2  Cir. 2011), or it may otherwise be apparent that "substantive evidence could be made use of at

3  trial," *Lindell v. Synthes USA*, ___ F. Supp. 3d ___, 2016 WL 70305, at *2 (E.D. Cal. Jan. 6,

4  2016) (citation and quotation marks omitted).  General objections based on lack of foundation

5  also are overruled.

6        B.    <u>River City's Late-Filed Declarations</u>

7        CSPA objects as untimely to the supplemental declaration of Bryan Wilson, owner

8  and operator of River City, ECF No. 36, and the declaration of David Zweig, the president of

9  Analytical Environmental Services, an environmental consulting firm retained by River City in

10  May 2014 to assist with water quality regulatory compliance issues, ECF No. 35, because the

11  declarations were not filed until January 15, 2016, while the deadline for River City to file its

12  opposition was December 4, 2015.  Local Rule 142 provides that any affidavit shall be "filed with

13  the . . . opposition . . . to which it relates, unless accompanied by an affidavit of counsel

14  purporting to show good cause for the separate filing thereof . . . ."  River City has provided no

15  explanation for the filing of these two declarations more than a month after they were due.  The

16  Wilson supplemental declaration and the Zweig declaration both are STRICKEN.

17        C.    <u>Bryan Wilson Declaration</u>

18        The court divides into five categories CSPA's objections to the declaration of

19  Bryan Wilson, owner and operator of River City, CSPA Evid. Obj., ECF No. 41, and addresses

20  them below: (1) legal conclusions; (2) improper lay witness opinion testimony; (3) hearsay; (4)

21  contradictory testimony; and (5) self-serving testimony.[2]

22        1.    <u>Legal Conclusions</u>

23        CSPA objects to several statements in the Wilson declaration, contending they are

24  legal conclusions.  *See, e.g.*, CSPA Evid. Obj., ECF No. 41 at 5, 10.  Legal conclusions are

25

26        [2] River City also raises a few objections to the declaration of Jim Crenshaw, CSPA's

27  president and a member of its Board of Directors, River City Evid. Obj. ¶ 3, ECF No. 30.
   However, as those arguments were concurrently discussed with CSPA's standing, the court

28  addresses them together below.

1    inadmissible when presented as lay testimony.  *See e.g.*, *Nationwide Transp. Fin. v. Cass Info.*

2    *Sys., Inc.*, 523 F.3d 1051, 1060–61 (9th Cir.2008) (lay witnesses may not tell the finder of fact

3    what result to reach).  CSPA's objections are SUSTAINED to the extent Wilson offers legal

4    opinions.

5                      2.      Improper Lay Witness Opinion Testimony

6            CSPA objects to certain declaration testimony as improper lay opinion.  Federal

7    Rule of Evidence 701 requires that non-expert witnesses restrict their testimony to opinions that

8    are rationally based on their perception, helpful to understanding their testimony or to

9    determining a fact at issue, and not based on specialized knowledge.  Fed. R. Evid. 701; *Taylor v.*

10   *Shippers Transp. Exp., Inc.*, No. 13-2092, 2014 WL 7499046, at *3 (C.D. Cal. Sept. 30, 2014).

11           Here, the majority of CSPA's objections focus on legal conclusions, not improper

12   opinion testimony.  *See, e.g.*, Wilson Decl. ¶ 10 ("From the beginning . . . extensive planning took

13   place to protect and address exposure of heavy metal to water."); *id.* ¶ 11 ("Prior to the excavation

14   of the ditch and work on the detention basin [River City] had implemented numerous other

15   BAT/BCTs.").  As stated above, the court sustains objections to legal conclusions.

16           CSPA's remaining objections concern irrelevant evidence the court does not

17   consider in this order.  Accordingly, CSPA's objections in this respect are OVERRULED.

18                      3.      Hearsay

19           CSPA also objects to various statements as hearsay.  Hearsay statements are those

20   made outside a court proceeding that are offered to prove the truth of the matter asserted.  Fed. R.

21   Evid. 801(c).  Summary judgment cannot be granted on the basis of inadmissible hearsay

22   evidence.  *See Shippers Transp.*, 2014 WL 749904, at *4.  But the court may consider hearsay

23   evidence offered by one who opposes summary judgment if the statements in question could be

24   presented in admissible form at trial.  *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).

25           CSPA objects to the following statements in Wilson's declaration as hearsay:  "I

26   am informed that a 10-year rain event produces water at approximately the 85th percentile . . . ,"

27   Wilson Decl. ¶ 7; "Storm water pollution preventions [sic] plans and compliance are frequent

28   discussion points in our conversation," *id*; ¶ 9; "all of these other recycling businesses are fully

1   permitted," *id.*; "none of these other recycling businesses have, or are required to have, storm

2   water detention basins . . . ," *id.*; "[a]ll inspections by the Regional Water Board of the . . .

3   recycling facility passed The Clean Water Act standards and requirements," *id.* ¶ 17; and "[n]o

4   violations have ever been issued to defendant River City by the Regional Water Board, and all

5   BATs/BCTs recommended by the Regional Water Board . . . were promptly implemented," *id.*

6   The court finds these statements irrelevant in the context of the pending motion.  CSPA's

7   objections with respect to them are OVERRULED as moot.

8        Wilson also makes averments along the lines of "[CSPA's] representatives on the

9   visits agree with me" or "[CSPA's] counsel . . . said . . . directly to me."  To the extent these

10  statements are offered to prove the truth of the communication described, they are the statements

11  of River's City's opponent or of one of its representatives and therefore are not hearsay.  *See* Fed.

12  R. Evid. 801(d)(2) .  CSPA's objections to these statements are also OVERRULED.

13        4.    Contradictory Deposition and Declaration Testimony

14        CSPA objects to several statements Wilson made in his declaration on the basis

15  that the statements contradicted his earlier deposition testimony.  *See, e.g.*, Wilson Decl. ¶ 3

16  ("From the beginning of the business, I have used Best Available Technology . . . and Best

17  Convention Pollution control Technology . . . .");  *id.* ¶ 4 ("In this manner, the detention basin was

18  created at the natural and existing two-foot depression . . . .");  *id.* ("The berm and the detention

19  basin were designed to channel and retain surface runoff water so that there would be no surface

20  water runoff from the Property . . . .").  The Ninth Circuit has held "that a party cannot create an

21  issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut.*

22  *Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  But this rule "does not automatically dispose of

23  every case in which a contradictory affidavit is introduced to explain portions of earlier

24  deposition testimony."  *Id.* at 266–67.  To apply the rule, the district court must first make the

25  factual determination the contradiction is actually a sham.  *Id.* at 267.  To trigger an exclusion, the

26  inconsistency must be "clear and unambiguous."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989,

27  998 (9th Cir. 2009).

28

5

1    The court finds that CSPA has not sufficiently established the inconsistencies here

2  are "clear and unambiguous."  CSPA's objections to these statements are OVERRULED to the

3  extent they are not addressed by rulings already made above.

4           5.      Self-Serving Declarations

5           Declarations often are self-serving, because a party submits them to support his or

6  her position.  *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).  The source of declaration

7  evidence may have some bearing on its credibility and on the weight it may be given by a trier of

8  fact, but the district court may not disregard evidence at the summary judgment stage solely based

9  on its self-serving nature.  *See id.*

10          At the same time, a self-serving declaration does not always create a genuine issue

11 of material fact precluding summary judgment:  The district court can disregard a self-serving

12 declaration that states only conclusions and not facts.  *See id.*; *see also Villiarimo v. Aloha Island*

13 *Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) (district court properly disregarded

14 declaration including facts beyond declarant's personal knowledge without indicating how she

15 knew facts to be true); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.

16 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence,

17 is insufficient to create a genuine issue of material fact.").

18          Bearing in mind these principles, the court will not disregard a declaration solely

19 because it is self-serving.  CSPA's objections to the Wilson Declaration on this ground are

20 OVERRULED.

21 II.    JUDICIAL NOTICE

22          CSPA requests the court take judicial notice of the following items under Federal

23 Rule of Evidence 201(b), and River City does not object:

24          (1) Exhibit A: the statewide 1997 NPDES Permit, titled Waste Discharge

25 Requirements (WDRs) for Discharges of Storm Water Associated with Industrial Activities

26 Excluding Construction Activities, State Water Resources Control Board Water Quality Order

27 No. 97-03-DWQ, NPDES General Permit No. CAS000001 (1997 General Permit).

28

                                        6

1          (2) Exhibit B: the 2014 NPDES General Permit for Storm Water Discharges

2  Associated with Industrial Activities, State Water Resources Control Board Order No. 2014-

3  0057-DWQ, NPDES General Permit No. CAS000001 (2015 General Permit), effective as of

4  July 1, 2015.

5          (3) Exhibit C: excerpts from the United States Environmental Protection Agency

6  (EPA), Storm Water Multi-Sector General Permit for Industrial Activities (MSGP).  65 Fed. Reg.

7  64,746, 64,767 (Oct. 30, 2000).

8          (4) Exhibit D: the judicial opinion issued in *Ecological Rights Foundation v.*

9  *Sierra Pacific Industries*, No. 01-0520 (C.D. Cal. Oct. 29, 1999).

10         (5) Exhibit E: the judicial opinion issued in *Santa Monica BayKeeper v. SunLite*

11  *Salvage, Inc., et al.*, No. 99-04578 (C.D. Cal. Dec. 15, 1999).

12         (6) Exhibit F: excerpts of the Water Quality Control Plan for the Sacramento River

13  and San Joaquin River Basins (Basin Plan) (September 1, 1998).

14  *See* Request for Judicial Notice (RJN), ECF No. 23.

15         All of these exhibits are relevant to CSPA's motion for summary judgment and are

16  either judicial or quasi-judicial documents.  The court judicially notices them.  *Cal. Sportfishing*

17  *Protection Alliance v. Callaway*, No. 10-1801, 2012 WL 5949109, at *6 (E.D. Cal. Nov. 28,

18  2012), *report and recommendation adopted*, 2013 WL 875961 (E.D. Cal. Mar. 7, 2013); *S.F.*

19  *Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 770 n.13 (N.D. Cal. 2011).

20  III.    <u>STATUTORY AND REGULATORY BACKGROUND</u>

21         The Clean Water Act prohibits "the discharge of any pollutant by any person" into

22  the waters of the United States without a permit issued under the National Pollutant Discharge

23  Elimination System (NPDES).  33 U.S.C. §§ 1311(a), 1342.  "NPDES permits are issued by [the

24  United States Environmental Protection Agency (EPA)] or by States that have been authorized by

25  EPA to act as NPDES permitting authorities."  *Envtl. Def. Ctr., Inc. v. U.S. E.P.A*, 344 F.3d 832,

26  841 (9th Cir. 2003) (citing 33 U.S.C. §§ 1342(a)–(b)).

27         Specifically, authority to issue permits under the NPDES is vested with the

28  Administrator of the EPA, but the authority may be delegated to the states.  33 U.S.C. § 1342(b).

1   California has been granted permitting authority.  *Santa Monica Baykeeper v. Kramer Metals,*

2   *Inc.*, 619 F. Supp. 2d 914, 919 (C.D. Cal. 2009).  California issued the statewide 1997 General

3   Permit, which applies to all storm water[3] discharges requiring a permit except construction

4   activity.  RJN, Ex. A.  California later issued the 2015 General Permit, which superseded the

5   1997 General Permit and became effective on July 1, 2015.  RJN, Ex. B.  Noncompliance with a

6   General Permit in effect at the time constitutes a violation of the Clean Water Act.  *See* 40 C.F.R.

7   § 122.41.  Violation of a General Permit condition is subject to a civil penalty of up to $25,000

8   per day under section 309 of the Clean Water Action.  33 U.S.C. § 1319(d).

9            The parties agree the General Permits apply in this case, beginning on their

10  effective dates; the issue is whether River City complied with the General Permits.  The court first

11  reviews the requirements of the General Permits.

12       A.     General Permits

13           In 1991, as provided by section 402(p) of the Clean Water Act, the California State

14  Water Resources Control Board issued a statewide General Permit, the 1997 General Permit,

15  applicable "to all storm water discharges requiring a permit except construction activity."[4]  RJN

16  Ex. A at 4 ("RJN-A-004").  Recycling facilities, identified by SIC code 5093,[5] such as metal

17  scrap yards, battery reclaimers, salvage yards, and automobile yards, are facilities covered by the

18  1997 General Permit.  RJN-A-005, 068.  The relevant portions of the 2015 General Permit reflect

19  the same standards as the 1997 General Permit, unless otherwise noted below, and also cover

20  facilities identified by SIC code 5093.  RJN-B-152.  The court first notes the relevant standards

---

21          [3] "Storm water" under the 1997 General Permit, excluding infiltration and runoff from

22  agriculture land, means storm water runoff, snow melt runoff, and storm water surface runoff and

    drainage.

23          [4] The 1997 General Permit was issued in 1991.  Between 1991 and 1997, existing facility

24  operators were allowed to continue to comply with the requirements of the prior General Permit,

    through June 30, 1997.  RJN-A-009.

25          [5] The analytical parameters listed in Table D are dependent on a facility's Standard

26  Industrial Classification (SIC) code.  RJN-A-042.  The SIC is a system used by certain United

    States' government agencies for classifying industries by a four-digit code in order to standardize

27  the way agencies measure, analyze, and share data.  *See* Wikipedia, *Standard Industrial*

    *Classification*, http://en.wikipedia/wiki/Standard_Industrial_Classification (describing and

28  defining SIC) (as of Apr. 28, 2016, 16:09 GMT).

1   below and highlights any specific differences between the 1997 and 2015 General Permits in the

2   next section below.

3         B.      <u>Conditions of Compliance under the General Permits</u>

4             1.      <u>Effluent Limitations</u>

5         Facility operators must meet the applicable standards for discharge of pollutants

6   using the best available technology economically achievable (BAT) and the best conventional

7   pollutant control technology (BCT) to prevent and reduce pollutants in storm water discharges,

8   under Clean Water Act section 301, which regulates pollutant discharges, and section 402, which

9   provides the NPDES requirements.  RJN-A-010.  The 2015 General Permit's effluent limitations

10  section does not differ in any significant way from that in the 1997 Permit.  RJN-B-020

11  ("Dischargers shall implement [best management practices (]BMPs[)] that comply with the

12  BAT/BCT requirements . . . to reduce or prevent discharges of pollutants . . . in a manner that

13  reflects best industry practice considering technological availability and economic practicability

14  and achievability.").

15        The 1997 General Permit did not specifically define BAT or BCT, but the 2015

16  General Permit does, defining BAT as a

17        technology-based standard established by the . . . Clean Water Act
          . . . as the most appropriate means available on a national basis for
18        controlling the direct discharge of . . . pollutants . . . .  The BAT
          effluent limitations guidelines, in general, represent the best
19        existing performance of treatment technologies that are
          economically achievable within an industrial point source . . . .
20

21  RJN-B-154.  The 2015 General Permit defines BCT as "a technology-based standard for the

22  discharge from existing industrial point sources of conventional pollutants including . . . Total

23  Suspended Solids (TSS) . . . ."  *Id.*

24            2.      <u>Receiving Water Limitations</u>

25        The 1997 and 2015 General Permits provide that facility operators must not cause

26  or contribute to a violation of applicable water quality standards through the facility's storm water

27  discharges.  RJN-A-010; RJN-B-023.  One of the applicable water quality standards here is the

28  California Toxics Rule (CTR), 40 C.F.R. § 131.38.  *See Kramer,* 619 F. Supp. 2d at 926–27.  The

1    CTR limits the level of toxic pollutants in storm water discharges in California.  40 C.F.R. §

2    131.38(b)(1).  Within California, the Sacramento River and the San Joaquin River Basins have

3    additional water quality standards provided by a single "Basin Plan."[6]  Basin Plan, at i-1.00, I-

4    1.00.  Specifically, as relevant here, the Basin Plan sets water quality standards for the

5    Sacramento River and its tributaries, including Morrison Creek, into which storm water from the

6    municipal storm drain adjacent to the Facility flows.  *Id.* at I-1.00, IV-33.29.

7            Reduction or prevention of pollutants in storm water discharges is accomplished

8    through the development and implementation of BMPs under the General Permits.  RJN-A-010.

9    BMPs consist of "schedules of activities, prohibitions of practices, maintenance procedures, and

10   other management practices to prevent or reduce the pollution of the waters of the United States."

11   RJN-A-077.  "BMPs also include treatment measures, operating procedures, and practices to

12   control facility site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw

13   material storage."  *Id.*  "BMPs may include any type of pollution prevention and pollution control

14   measure necessary to achieve compliance with the General Permit."  *Id.*  Implementation of

15   BMPs constitutes compliance with BAT and BCT and, in most cases, compliance with water

16   quality standards.  RJN-A-010.

17          The requirement of compliance with applicable water quality standards is also

18   known as the receiving water limitation in Section C(2) in the 1997 General Permit.  RJN-A-019.

19                    3.    Storm Water Pollution Prevention Plan (SWPPP)

20          The 1997 and 2015 General Permits require facility operators to develop and

21   implement a SWPPP to help identify the sources of pollution that affect the quality of industrial

22   storm water discharges and authorized non-storm water discharges, and describe and ensure the

23   implementation of BMPs.  RJN-A-011; RJN-B-007, 026, 028–29.  A SWPPP must include the

24   following: (a) a site map with different areas and boundaries clearly delineated, RJN-A-028–29,

25   (b) a list of raw materials, intermediate products, final or finished products, recycled materials,

26

27          [6] Above, the court took judicial notice of certain excerpts of the Basin Plan at CSPA's
     request.  *See supra* p. 7.  For purposes of this order, the court also takes judicial notice of
28   additional portions of the Basin Plan at pages i-1.00, I-1.00 and IV-33.29.

1    and waste or disposed materials, *id.*, (c) a description of potential pollutant sources and a

2    summary of all industrial activities and potential pollutant sources, and potential pollutants,

3    RJN-A-029–31, (d) an assessment of all industrial activities and potential pollutant sources as

4    described above, RJN-A-032, and (e) a description of the storm water BMPs to be implemented

5    for each potential pollutant and its source identified from the foregoing assessment, *id.*

6                              4.    Monitoring and Reporting

7                 The 1997 General Permit requires facility operators to develop and implement a

8    monitoring program to (a) demonstrate compliance with the 1997 General Permit, (b) help

9    implement the SWPPP, and (c) measure BMPs' effectiveness in reducing or preventing pollutants

10   in storm water discharges and authorized non-storm water discharges.  RJN-A-012.  Specifically,

11   all facility operators, except inactive mining operations, must (i) make visual observations of

12   storm water discharges; and (ii) collect and analyze samples of storm water discharges, noting

13   specifically pH,[7] total suspended solids (TSS), total organic carbon (TOC), toxic chemicals, and

14   pollutants listed in Table D of the 1997 General Permit.  RJN-A-012; RJN-A-039–44.  Oil and

15   grease (O&G) may be substituted for TOC.  RJN-A-042.  The 2015 General Permit provides that

16   samples should be collected for TSS, O&G, and pH.  RJN-B-041.

17                 Sample collection and visual observations are required only during "scheduled

18   facility operating hours," which are times when "the facility is staffed to conduct functions related

19   to industrial activity," but exclude times when "only routine maintenance, emergency response,

20   security, and/or janitorial services are performed."  RJN-A-040; RJN-B-159.  Visual observations

21   are required only during daytime hours.  If unable to collect the required samples or make the

22   visual observations, facility operators must provide explanations in their annual reports.  Facility

23   operators must retain records of all monitoring information, copies of all reports required by the

24   applicable General Permit, and records of all data used to complete the Notice of Intent for five

25   years from the date of measurement, report, or monitoring.

26

27                 _____

28          [7] As defined in the 2015 General Permit, in chemistry a "pH" value expresses the intensity
     of an acidic or alkaline solution.  RJN-B-158.

                                                    11

1         The 2015 General Permit provides similar requirements with two exceptions as

2 noted below.  RJN-B-037–43; see *infra*, notes 4, 5.

3       C.    <u>Significant Changes between the 1997 and 2015 General Permits</u>

4         The 2015 General Permit requires dischargers to implement a set of minimum

5 BMPs along with any advanced BMPs necessary to reduce or prevent pollutants in storm water

6 discharges.  RJN-B-082.  The 1997 General Permit did not require minimum BMPs but allowed

7 dischargers to consider which non-structural BMPs should be implemented.  RJN-B-083.  The

8 minimum and advanced BMPs required in the 2015 General Permit are consistent with EPA's

9 2008 Multi-Sector General Permit for Storm Water Discharges Associated with Industrial

10 Activity (2008 MSGP), guidance developed by the California Storm Quality Association and

11 Regional Water Quality Control Board inspectors.  *Id.* at 82–83.

12         The 2015 General Permit also requires dischargers to submit and certify all reports

13 electronically.  *Id.*  The previous Permit used a reporting process with electronic reporting as an

14 option.  *Id.*

15         The 2015 General Permit also includes design storm standards for dischargers

16 implementing treatment control BMPs.  RJN-B-085.  The standards include both volume- and

17 flow-based criteria.  RJN-B-036.  Specifically, the minimum standard required under the 2015

18 General Permit provides that treatment control BMPs should be able to treat the runoff produced

19 from an 85th percentile 24-hour storm event as determined from local, historical rainfall records.

20 *Id.*

21 IV.    <u>UNDISPUTED FACTS</u>

22       A.    <u>River City</u>

23         River City owns and operates the Facility.  Resp. Stmt. Undisp. Material Facts

24 (UMF) nos. 1, 4–6.  Bryan Wilson is its sole member and manager.  Wilson Decl. ¶ 1, ECF

25 No. 29.  The Facility began operations in April 2011.  UMF no. 2.  The Facility covers

26 approximately 3 acres and includes a yard, an office, two scales, and equipment.  UMF nos. 3, 4.

27 Only a small portion of the Facility is covered; the rest of the site is exposed to storm water flows.

28 UMF no. 10.

1          B.      CSPA

2                  CSPA is a non-profit public benefit corporation organized under California state

3    law.  Its more than 2,000 members use the Sacramento River and the Sacramento-San Joaquin

4    Delta (the Delta) and its tributaries for recreational, scientific, aesthetic, educational and

5    conservational purposes, including fishing, boating, fish and wildlife observation, and hiking.

6    UMF nos. 24, 26, ECF No. 28; Crenshaw Decl. ¶¶ 3-4.

7                  CSPA promotes the conservation, restoration, and enhancement of California's

8    fishery resources and the aquatic and terrestrial habitats these resources depend on.  It advocates

9    for the preservation of land and aquatic habitat for scientific, historic, recreational, educational,

10   agricultural, and scenic or open space opportunities.  It promotes social welfare through the

11   protection, enhancement, and restoration of sportfishing in California.  UMF no. 25; Crenshaw

12   Decl. ¶ 4.  CSPA also seeks out those who violate state or federal water quality control and

13   endangered species regulations.  UMF no. 28.  Its members are concerned about the discharge of

14   contaminated storm water into the Sacramento River and the Delta, because those discharges

15   upset the natural balance of the ecosystem and destroy its natural beauty.  UMF no. 27.

16                 On March 31, 2014, CSPA served a Notice of Violation and Intent to File Suit

17   under the Clean Water Act (Notice Letter) on River City, with copies sent to the EPA, the State

18   Water Resources Control Board, the U.S. Department of Justice, and the Central Valley Regional

19   Water Quality Control Board.  UMF no. 33.

20                 1.      Effluent Limitations

21                 Storm water discharged from the Facility is regulated by the 1997 and 2015

22   General Permits.  UMF no. 7.  River City's operations include storing, sorting, processing, and

23   recycling scrap metal, electronics, car parts, bottles and cans, cardboard, pallets, concrete, and

24   other materials, which are stored in piles, open dumpsters, and containers.  UMF no. 8.  River

25   City's operations also include vehicle fueling, maintenance, and repair work.  UMF no. 9.

26   Pollutant sources associated with these activities include the outdoor storage and processing of

27   scrap metal, car parts, electronics, and used appliances; piles of concrete; shipping and receiving

28

13

1    areas; loading and unloading areas; and areas where vehicles and equipment are fueled,

2    maintained, and stored.  UMF no. 11.

3                The Facility collects and discharges storm water via a single outflow point, a storm

4    drain at its northwest corner, which empties onto Watt Avenue from the Facility's location on

5    Elder Creek Road in Sacramento, California.  UMF nos. 1, 12,13.  Water in the storm drain flows

6    into Morrison Creek, which flows into the Sacramento River, and then into the Sacramento-San

7    Joaquin Delta.  *Id.*

8                At some point during River City's operation, protections were taken against the

9    risk of exposing heavy metals[8] to storm water discharges such as
     placement of straw wa[tt]les[9] around all areas where heavy metals
10   were processed, processing of metals on concrete surfaces, keeping
     metal in water sealed containers, and using tarps to cover those
11   containers in case of a rain event.

12   Wilson Decl. ¶ 11.

13               River City also placed concrete blocks around the concrete pad in the metal

14   processing area to prevent pollutants from flowing into the water before the detention basin was

15   excavated in 2014 to collect the storm water discharges.  Davis Decl. Ex. H at DDH007; *id.* Ex. I

16   at DDI002-05; *id.* Ex. AA at DDAA001.

17               River City's 2011 and 2012 SWPPPs list the following BMPs: inspections of

18   heavy equipment, availability of spill cleanup kits for oil and fuel spills, wetting roadways to

19   reduce dust and fugitive wood particles, confinement of metal and wood recycling to the

20   operations area "to the extent practicable," periodic sweeping, and the use of fiber rolls, and tarps

21   to cover metal bins during storm events.  UMF no. 44.

22

23   ───────────────
          [8] The terms "heavy metal" and "metal" both are used in Wilson's declaration.  It is
24   uncertain if Wilson intends to use the two interchangeably to mean the same thing.
          [9] Straw wattles are man-made cylinders of compressed, weed free straw (wheat or rice),
25   eight to twelve inches in diameter and twenty to twenty-five feet long.  They are encased in jute,
     nylon, or other photo degradable material, and have an average weight of thirty-five pounds.
26   They are installed in a shallow trench forming a continuous barrier to intercept water.  *See*
     Contour Straw Wattle Fact Sheet, United States Department of Agriculture, Natural Resources
27   Conservation Services – Wyoming, www.nrcs.usda.gov/wps/portal/nrcs/detail/wy/
     technical/>cid=nrcs142p2_027274 (last visited Apr. 21, 2016).
28
                                              14

In November 2012, staff from the Central Valley Regional Water Quality Control Board (the Board) conducted a site visit at the Facility.  UMF no. 46.  The only BMP observed by the Board staff during this inspection was a fiber roll that the staff considered ineffective.  UMF no. 47.  "[N]o other BMPs were observed between the [metal processing area] and the outfall[10] area."  UMF no. 48.

In May 2014, in response to CSPA's March 2014 Notice Letter, Wilson excavated a ditch near River City's western property line to channel all storm water into the Facility's northwest outfall.  UMF no. 14.  No engineering plans or design drawings were prepared for this or any future excavation of the ditch.  UMF no. 18.  Wilson directed his employees to use the excavator onsite to dig the ditch "to a depth of about two feet."  UMF no. 19.  Wilson paced the length of the ditch, and estimated it to be roughly 200 feet, but no other actual measurements were taken.  Davis Decl. Ex. Y at DDY019.

The cost of the excavation was the cost of labor, fuel, and ongoing rent of the machine.  UMF no. 21.  Wilson estimated the cost of digging the ditch to be $2,000, which includes a portion of the rent of the excavator he keeps on site continuously, for use on site.  Davis Decl. Ex. Y at DDY020–21.

Since the Facility began operations in 2011, it has always been feasible to construct a detention basin capable of stopping storm water discharges from significant rain events, but a basin was not excavated until 2014.  UMF no. 23.  In October 2014, River City expanded the ditch built in May of that year, and excavated a basin at the end of the ditch to contain all storm water onsite using the onsite excavator.  UMF nos. 15–16.  The ditch and detention basin configuration was expanded a third time in early June 2015.  UMF no. 16.  After the third expansion, the storage capacity of the ditch and basin was 4,872 cubic feet.  UMF no. 52.

---

[10] Outfalls are locations where storm water exits a facility, including pipes, ditches, swales, and other structures that transport storm water.  EPA Storm Water Multi-Sector General Permit for Industrial Activities (MSGP) App'x G at 6, 65 Fed. Reg. 64,746, 64,767 (Oct. 30, 2000).

In December 2014, the Board notified River City of its BMPs' inadequacy during the previous two rainy seasons, and advised River City that "[t]he levels of pollutants in [its] storm water samples indicate the current BMPs implemented at [the Facility] are not sufficient to reduce pollutant concentrations below benchmark levels." UMF no. 49.

CSPA's expert hydrogeologist, a former EPA employee, Matthew Hagemann visited and inspected the Facility on December 3, 2014 and again on June 23, 2015. UMF no. 50. On June 23, 2015, Hagemann observed and photographed the detention basin, which was filled almost to the brim with muddy water and surrounded by mud and debris. UMF no. 51. He determined the basin was twenty-four feet and two inches wide, twenty-one and four inches to twenty feet wide, and two and a half to three feet deep. Hagemann Decl., Ex. A, ECF No. 21-1 at 31.

An 85th percentile, 24-hour storm, the minimum standard set by the 2015 General Permit, would generate 6,125 cubic-feet of water at the Facility. UMF no. 53. The capacity of the ditch and the basin at the Facility is insufficient to retain a storm of this size. UMF no. 54. The ditch and basin therefore do not meet the 2015 General Permit requirement for a volume-based treatment control BMP. Hagemann Decl. ¶ 15; *id.* Ex. A at 4–5. An overflow structure is essential for the ditch and basin BMP because if the basin were to overflow, the earthen berm that serves as a makeshift back-up impoundment structure could be breached. UMF no. 57. A breach would result in a sediment-laden discharge to the municipal storm water drain inlet, located twenty feet from the earthen berm at the Facility's northern boundary. UMF no. 57.

2.   Receiving Water Limitations

The parties do not dispute the applicability of the EPA benchmark for SIC 5093 facilities[11] or the Basin Plan as a water quality standard in receiving water limitation Section C(2) of the 1997 General Permit. This limitation prohibits storm water discharges and authorized non-storm water discharges from causing or contributing to an exceedance of any applicable water quality standards contained in the Basin Plan. RJN-A-019.

---

[11] As part of the compliance requirements under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, EPA sets out sector-specific benchmarks for SIC 5093 facilities. RJN-C-011.

1    CSPA has submitted reports of water sampling analyses of storm water samples

2    taken at River City by River City on April 26, 2012, October 22, 2012, April 4, 2013, and March

3    10, 2014.  Davis Decl. Exs. U, V, W, X; *see also id.* Ex. G.  In all four samplings, aluminum,

4    copper, and iron exceeded the EPA benchmark.  UMF nos. 61–75.  Total Suspended Solids (TSS)

5    and zinc exceeded the EPA benchmark on three occasions.  UMF nos. 81–88.  Lead exceeded the

6    EPA benchmark on two occasions.  UMF nos. 77–78.  Chemical Oxygen Demand (COD)

7    exceeded the EPA benchmark on one occasion.  UMF nos. 79-80.

8    The Basin Plan incorporates the maximum contaminant levels (MCL) and

9    secondary maximum contaminant levels (SMCL) from Table 64449-A, Title 22 of the California

10   Code Regulations.  UMF nos. 89–90; *see also* 22 Cal. Code Regs. § 64449.  In all four samplings,

11   aluminum and copper exceeded one or both of the MCL and SMCL levels.  UMF nos. 91-100.

12   On three occasions, iron exceeded the Basin Plan water quality objective and SMCL levels, and

13   zinc exceeded the water quality objective.  UMF nos. 101–06, 110–13.  On two occasions, lead

14   exceeded the water quality objective.  UMF nos. 108-09.

15         3.    SWPPPs

16   Within the time periods demarcated by the statute of limitations applicable to this

17   case, River City has operated under four SWPPPs.  UMF no. 114.  River City's first SWPPP was

18   prepared in September 2011 (SWPPP I).  UMF no. 115; *see also* Davis Decl. Ex. L.  SWPPP II,

19   only slightly revised from the first,[12] was prepared in September 2012.  UMF no. 116; *see also*

20   Davis Decl. Ex. M.  The third version, SWPPP III, was prepared in July 16, 2014.  UMF no. 117;

21   *see also* Davis Decl. Ex. N.  SWPPP IV was prepared June 29, 2015.  UMF no. 118; *see also*

22   Davis Decl. Ex. O.

23   SWPPP I and SWPPP II did not identify containment of storm water as a BMP for

24   the facility.  UMF no. 119.  The "detention basin" described in SWPPP III referred to a

25   depression in the ground adjacent to the Facility's discharge location, which did not prevent storm

26

27   [12] SWPPP I contained an additional paragraph at the end, which stated that "Bryan Wilson
     has been trained in proper environmental sampling protocol . . . and has the authority to designate
28   and cross train alternate personnel . . . ."  Davis Decl. Ex. L.

1    water from discharging.  UMF no. 120.  River City planned and implemented a detention basin

2    designed to contain storm water after SWPPP III was prepared.  UMF no. 121.  None of the four

3    SWPPPs discusses electronic goods as a source of pollutants even though consumer electronics

4    were and are a potential source of pollutants at the Facility.  UMF nos. 122–23.

5            Car parts, engines, engine parts, radiators, automotive batteries, and alternators are

6    and have been found at the Facility since the beginning of its operation in 2011.  UMF no. 125.

7    The SWPPPs address the handling of equipment used in River City's recycling business and the

8    equipment's hydraulic fluid and fuel, but do not address car parts.  Davis Decl. Ex. L at

9    DDL006-008; *id.*, Ex. M at DDM007–008; *id.* Ex. N at DDN008–009; *id.*, Ex. O at DDO007–

10   009.  The SWPPPs also generally identify metal, but do not specifically list out the significant

11   materials handled and stored at the site, or how they were stored, received, shipped, or handled.

12   Davis Decl., Exs. L, M, N, O.

13           In River City's response to CSPA's first set of requests for admission, River City

14   states that the maps for River City's SWPPP II and SWPPP III appear in the record as separate

15   documents.  Davis Decl. Ex. E at DDE012; *id.* Ex. G at DDG007-008.  However, the map that

16   allegedly accompanied SWPPP II is not before the court.  Instead, the record contains only the

17   maps for SWPPP III and SWPPP IV.  *See* Davis Decl. Exs. P & Q.

18           The 2014 map submitted with SWPPP III does not depict the southern boundary of

19   the Facility or the berm installed in July 2014.  Davis Decl. Ex. P.  The 2014 map does depict a

20   detention basin and a ditch.  *Id.*  No locations of exposed materials are depicted.  *Id.*  The 2014

21   map provides only the following clearly demarcated areas: the ditch, the basin, a neighboring

22   tenant, paved areas, the owner's storage, the office, a business next door, and the Facility's

23   northern and western borders of  Elder Creek Road and South Watt Avenue.  *Id.*

24           River City's monitoring program described in each of the four SWPPPs indicates

25   the Facility will only analyze storm water samples for pH, Specific Conductance,[13] TSS, TOC,

26

27           [13] Specific Conductance is a measure of how well water can conduct an electric current.
     *See* City of Boulder/USGS Water Quality Monitoring, *General Information on Specific

28   Conductance*, http://bcn.boulder.co.us/basin/data/NEW/info/SC.html (as of Aug. 30, 2016).

18

1   and O&G, with no indication of whether the Facility will analyze storm water samples for heavy

2   metals (lead, copper, zinc, aluminum, and iron) or COD.  UMF no. 136.

3            SWPPP II and III were not signed or certified.  Davis Decl., Ex. E at DDE012; *id.*

4   Ex. G at DDG007–08.

5            4.    <u>Monitoring and Reporting Program</u>

6            River City's annual reports do not reflect any monthly visual observations of storm

7   water discharges for: February 2012, May 2012, November 2012, December 2012, January 2013,

8   February 2013, March 2013 and May 2013.  Davis Decl. Ex. R at DDR016; *id.* Ex. S at DDS016,

9   018.  Precipitation had occurred in those months, but it is uncertain if any storm occurred during

10   "scheduled facility operating hours" when industrial activity was occurring, because the record

11   does not show at what time each storm occurred.  Davis Decl. Ex. B at DDB039; RJN-A-040.

12   There was no analysis of iron, aluminum, lead, copper, zinc, or COD levels in the 2011/2012

13   annual report for the Facility.  Davis Decl. Ex. R at DDR009.  River City sampled and analyzed

14   only one rain event during the 2013-2014 wet season.  UMF no. 140.  River City did not analyze

15   the storm water it sampled on April 4, 2013 for chemical oil and grease or TOC.  UMF no. 141;

16   Davis Decl. Ex. W at DDW004.  River City's 2013/2014 annual report did not report the COD

17   levels in its storm water sample taken on March 10, 2014.  UMF no. 142.[14]

18   V.     <u>LEGAL STANDARD</u>

19            Summary judgment is appropriate where the court is satisfied "there is no genuine

20   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

21   Fed. R. Civ. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues

22   that properly can be resolved only by a finder of fact because they may reasonably be resolved in

23   favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  When the

24   court looks at the evidence presented by the parties, "[t]he evidence of the non-movant is to be

25   believed, and all justifiable inferences are to be drawn in . . . [the] [non-movant's] favor." *Id.*

26   at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

27

28            [14] The parties confirmed at the hearing that UMF no. 142 as articulated in the record omits
the word "not."

1  obligation to produce a factual predicate from which the inference may be drawn.  *See*

2  *Mayweathers v. Terhune*, 328 F. Supp. 2d 1086, 1092–93 (E.D. Cal. 2004); *UMG Recordings,*

3  *Inc. v. Sinnott*, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004).

4       The moving party bears the initial burden of demonstrating to the court "that there

5  is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.  If

6  the burden of persuasion at trial would be on the non-moving party, the movant may satisfy the

7  initial burden by either (1) introducing affirmative evidence that negates an essential element of

8  the non-moving party's claim; or (2) showing that the non-moving party's evidence is insufficient

9  to establish an essential element of the non-movant's case. *Id.* at 331.  When the non-moving

10  party adopts the second option, conclusory statements that the non-moving party lacks any

11  evidence are insufficient to meet the initial burden. *See id.*

12       Once the moving party satisfies this initial burden, the burden then shifts to the

13  non-moving party, who "must establish that there is a genuine issue of material fact . . . ."

14  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  A fact is

15  "material" when it might affect the outcome of the suit under the applicable substantive law

16  governing the claim. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the

17  outcome of the suit under the governing law will properly preclude the entry of summary

18  judgment.").  A factual dispute is "genuine" where the evidence is such that "a reasonable jury

19  could return a verdict for the non-moving party." *Id.*  The non-moving party "must do more than

20  simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.  Rather,

21  to survive summary judgment, the non-moving party must "make a showing sufficient to

22  establish the existence of [every] element essential to that party's case, and on which that party

23  will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

24       In carrying their burdens, both parties must "cit[e] to particular parts of materials

25  in the record . . . ; or show [ ] that the materials cited do not establish the absence or presence of a

26  genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

27  Fed. R. Civ. P. 56(c)(1).  "A genuine issue of material fact does not spring into being simply

28  because a litigant claims that one exists or promises to produce admissible evidence at trial."

20

1   *Del Carmen Guadalupe v. Agosto*, 299 F.3d 15, 23 (1st Cir. 2002); *see Galen v. Cty. of L.A.*,

2   477 F.3d 652, 658 (9th Cir. 2007); *Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1167

3   (9th Cir. 2002).

4         The court may examine pleadings, depositions, answers to interrogatories, and

5   admissions on file, together with the affidavits, if any.  *See* Fed. R. Civ. P. 56(c); *Fortyune v.*

6   *American Multi-Cinema, Inc.*, 364 F.3d 1075, 1079–80 (9th Cir. 2004).  Additionally, in

7   resolving the merits of a party's motion for summary judgment, the court's role is not to evaluate

8   the evidence and decide the truth, but to determine whether there is a genuine issue for trial.

9   *Anderson*, 477 U.S. at 249.  Thus, for instance, competent testimony by a single declarant may

10  defeat summary judgment though opposed by many other declarants.  *United States v. 1 Parcel of*

11  *Real Prop., Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487, 491–92 (9th Cir. 1990).

12        The court has the discretion in appropriate circumstances to consider materials that

13  are not properly brought to its attention, but the court is not required to examine the entire file for

14  evidence establishing a genuine issue of material fact where the evidence is not set forth in the

15  opposing papers with adequate references.  *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d

16  885, 889 (9th Cir. 2003); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

17  VI.   <u>DISCUSSION</u>

18        CSPA's standing is a threshold matter and is discussed first.  Because the court

19  concludes CSPA has standing to bring this action, the court next addresses the particulars of civil

20  enforcement and whether a continuous violation occurred here.  Finally, it reaches the merits to

21  determine whether River City failed to comply with the General Permits as a matter of law.

22      A.   <u>Standing</u>

23        The court first decides whether Jim Crenshaw has standing as a member of CSPA,

24  its president and a member of its Board of Directors, which in turn provides standing for CSPA.

25  Second, the court decides whether Crenshaw's declaration is admissible at this stage of the

26  proceedings.

27        "A plaintiff has the burden to establish that it has standing." *WildEarth Guardians*

28  *v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015).  The doctrine of prudential standing

1    prohibits an individual from litigating another person's rights. *Id.* (quoting *Allen v. Wright*, 468

2    U.S. 737, 751 (1984)).  An organization has standing to bring suit on behalf of its members when:

3    "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks

4    to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the

5    relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash.*

6    *State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see also Int'l Union, United Auto.,*

7    *Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986).  Individual

8    members have standing in their own right under Article III if "they have suffered an 'injury in

9    fact' that is (a) concrete and particularized and (b) actual and imminent, not conjectural or

10   hypothetical, . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it

11   is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

12   decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167,

13   180–81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

14           River City raises five arguments, attacking Crenshaw's standing: (1) Crenshaw has

15   not identified any injury suffered, (2) Crenshaw lives too far from the Delta, (3) Crenshaw has

16   provided no support showing his use of the waters at issue here, (4) Crenshaw does not have the

17   expertise to identify River City as the cause of his injuries, and (5) Crenshaw has not traced the

18   alleged violations to River City.  Opp'n at 8.  The court addresses each argument in turn below.

19           First, River City contends Crenshaw has not shown a particular injury or harm he

20   suffered personally. *Id.*  The "injury in fact" requirement in environmental cases is satisfied if an

21   individual adequately shows he has an aesthetic or recreational interest in a particular place,

22   animal, or plant species and that this interest is impaired by a defendant's conduct. *See, e.g.,*

23   *Laidlaw*, 528 U.S. at 183; *Lujan*, 504 U.S. at 562–63; *Ecological Rights Found. v. Pac. Lumber*

24   *Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).  Specifically, an individual can establish "injury in

25   fact" by showing he has a sufficient connection to the area at issue to "make credible the

26   contention that [his] future life will be less enjoyable . . . if the area in question remains or

27   becomes environmentally degraded." *Pac. Lumber*, 230 F.3d at 1147.  Here, Crenshaw argues he

28   lives near the Sacramento River and the Delta, and regularly uses the waterway for outdoor

activities.  Crenshaw Decl. ¶ 14.  Specifically, he fishes, boats, kayaks, and conducts wildlife observations and photography on the Sacramento River and the Delta.  *Id.* ¶ 15.  In light of these facts, the court finds River City's argument unpersuasive.

Second, and also with respect to injury, River City argues Crenshaw lives too many miles from the Delta to suffer an injury.  Opp'n at 8.  The Ninth Circuit has found that

> a person who uses an area for recreational purposes does not have to show that he . . . lives particularly nearby to establish an injury-in-fact due to possible or feared environmental degradation. Repeated recreational use itself, accompanied by credible allegation[s] of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person.

*Id.* (citing *Laidlaw*, 120 S. Ct. at 705 (an individual who has canoed in the river would do so again if not for the discharges has stated an injury in fact)).  As stated above, even though Crenshaw does not live immediately next to the two bodies of water at issue here, he regularly participates in activities there and expresses a strong appreciation for the intangible values the bodies of water represent.  The court finds River City's second argument unpersuasive.

Third, River City argues Crenshaw has not established his use of the navigable waters within the Delta.  Opp'n at 8.  However, as in *Pacific Lumber* and *Laidlaw*, Crenshaw has stated he holds longstanding recreational and aesthetic interests in both the Sacramento River and the Delta.  Crenshaw explains he has used the Sacramento River and the Delta for fishing and other activities several times in the past, and he avers River City's conduct has impaired his enjoyment of the same activities.  He points out in his declaration that he often enjoys the activities in areas where he avers the "storm water is ultimately discharged into the Sacramento River from River City."  Crenshaw Decl. ¶ 14.  He also states that he has observed pollutants in the water and that the pollutants were discharged from River City.  *Id.* ¶ 15.  Lastly, Crenshaw expresses hope a reduction in the discharge of pollutants from River City will improve the water quality of the Sacramento River and the Delta, and allow him to enjoy recreational activities and nature unimpaired in the future.  *Id.* ¶¶ 18–19.  The court finds Crenshaw has provided sufficient information substantiating his use of the navigable waters here.

1          Fourth, River City argues Crenshaw does not have the expertise to identify River

2   City as the cause of the environmental harm he seeks to redress in this lawsuit.  Opp'n at 8.

3   However, the threshold question of individual standing under the Clean Water Act is "whether an

4   individual can show that [he] has been injured in [his] use of a particular area because of concerns

5   about violations of environmental laws, not whether the [he] can show there has been actual

6   environmental harm."  *Pacific Lumber*, 230 F.3d at 1151 (citing *Laidlaw*, 120 S. Ct. at 704;

7   *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 163–64 (4th Cir.

8   2000) (en banc)).  Crenshaw's concern with violations of environmental law is sufficient; he does

9   not require an expert to testify as to any actual environmental harm.

10          Fifth, like the defendant in *Pacific Lumber*, River City argues Crenshaw has failed

11   to trace any harm back to its Facility.  *See* Opp'n at 8 (citing 230 F.3d at 1152).  Again, echoing

12   the Ninth Circuit in *Pacific Lumber*, "the causal connection put forward for standing purposes

13   cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not

14   be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on

15   the merits."  230 F.3d at 1152.  The fact that Crenshaw derives less enjoyment from recreation in

16   the Sacramento River and the Delta due to River City's pollution does not require any "attenuated

17   chain of conjecture" or "presumptions that other actors will behave in any particular way" to

18   create the link between River City's alleged violations and Crenshaw's reduced enjoyment.  *Id.*

19   Crenshaw declares he believed River City discharged pollutants in its storm water flows and

20   contributed to the contamination of fish and waters downstream in the Sacramento River and the

21   Delta.  Crenshaw Decl. ¶ 17.  As a result, he could no longer enjoy his activities in the two bodies

22   of water as he did before.  *Id.* ¶¶ 16–19.  Crenshaw has satisfied the causation element of Article

23   III standing.

24          Finally, River City argues that Crenshaw's declaration lacks foundation, because

25   there is no basis for his naming of River City as the originator of any of the oil or other materials

26   he has observed in the water.  The court does not rely  on the declaration for purposes of

27   determining the merits of CSPA's Clean Water Act claim.  Rather, it considers the declaration for

28

24

1   the purpose of determining whether CSPA has standing.  Accordingly, River City's objection to

2   Crenshaw's declaration for lack of foundation is OVERRULED.

3            In sum, Crenshaw has standing.  River City's objection to his declaration is

4   accordingly OVERRULED.

5        B.    Civilian Enforcement

6            The court next considers River City's argument that it cannot have violated the

7   Clean Water Act because no public entity has undertaken an enforcement action.  Specifically,

8   River City points out that the Regional Water Quality Control Board never cited it for any

9   violations of the Clean Water Act.  Opp'n at 8.

10           River City's argument miscomprehends the policy behind citizen enforcement

11   actions.  "The Clean Water Act explicitly allows private citizens to bring enforcement actions

12   against any person alleged to be in violation of federal pollution control requirements."  *Ass'n to*

13   *Protect Hammersly v. Taylor Res.*, 299 F.3d 1007, 1012 (9th Cir. 2002) (citing 33 U.S.C.

14   § 1365(a)(1)) (citations omitted).  A would-be citizen enforcer must give sixty days' notice of her

15   intent to sue, and if the EPA or the State elects to commence an enforcement action within that

16   sixty-day period, the citizen enforcement suit is barred.  *Gwaltney of Smithfield, Ltd. v.*

17   *Chesapeake Bay Found.*, 484 U.S. 49, 59-60 (1987).  The Supreme Court has found this rule

18   suggests citizen enforcement suits are meant to supplement rather than "supplant governmental

19   action."  *Id.* at 60.

20           Finally, contrary to River City's argument, the absence of public enforcement is

21   not commensurate with compliance, given EPA's enforcement discretion.  *Id.* at 61.

22   Consequently, the court evaluates whether River City violated the Clean Water Act, as argued by

23   CSPA as a citizen enforcer.

24        C.    Continuous Violation

25           Third, the court considers whether the 2015 General Permit's standards apply in

26   this case.  CSPA argues River City did not comply with the 1997 General Permit in violation of

27   the Clean Water Act, 40 C.F.R. § 122.41, and continues not to be compliant with the 2015

28   General Permit, which took effect July 1, 2015.  River City contends the 2015 General Permit's

                                          25

1  standard is inapplicable to the case at hand, because CSPA's complaint was filed in June 2014,

2  prior to the 2015 General Permit's effective date.  River City's primary concern appears to be the

3  2015 General Permit's requirement that the Facility's BAT/BCT detention basin be capable of

4  containing runoff during an 85th percentile, 24-hour storm event.  Opp'n at 4, 8–9; Reply at 5–6.

5  Again, River City's argument runs contrary to Ninth Circuit precedent.

6         To prevail at trial, a citizen-plaintiff must prove ongoing violations by the

7  defendant.  "[A] citizen-plaintiff may prove ongoing violations 'either (1) by proving violations

8  that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a

9  reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or

10  sporadic violations.'"  *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 998 (9th Cir.

11  2000) (citation omitted).  "Intermittent or sporadic violations do not cease to be ongoing until the

12  date when there is no real likelihood of repetition."  *Id.*

13         To succeed here, CSPA must show ongoing violations at the Facility.  As noted

14  above, the 2015 General Permit superseded the 1997 General Permit and became effective on

15  July 1, 2015.  RJN-B-001.  River City is required to comply with both the 1997 and the 2015

16  General Permit.  *See* 33 U.S.C. §§ 1311(a), 1342.  Though CSPA's complaint may have been

17  filed prior to the effective date of the 2015 General Permit, noncompliance with the 2015 General

18  Permit is still a violation of the Clean Water Act and thus relevant to this case.  40 C.F.R.

19  § 122.41.  While it is true that any new standards under the 2015 General Permit are not

20  applicable prior to July 1, 2015, they are applicable to the Facility's actions after July 1, 2015 and

21  are relevant in defining what CSPA must prove to show continuous violations.

22         Accordingly, the court will consider whether River City complied with the 2015

23  General Permit after July 1, 2015.

24    D.    Noncompliance with the General Permits

25         In evaluating whether River City was noncompliant with the General Permits, the

26  court considers whether River City met the following requirements: (a) effluent limitations, (b)

27  receiving water limitations, (c) Storm Water Pollution Prevention Plans, and (d) monitoring and

28

26

1   reporting.  As part of the court's effluent limitations analysis, the court addresses whether River

2   City implemented any BMPs.

3                    1.     Effluent Limitations

4          First, the court considers whether River City achieved the required best available

5   and best conventional technology -- BAT/BCT -- at the Facility.  CSPA argues prior to the

6   excavation of the ditch and detention basin at the Facility in October 2014, the Facility had not

7   implemented any best management practices -- BMPs -- that could achieve BAT/BCT.  Mot. at 7.

8   The concrete blocks and the straw wattles that were in place, CSPA argues, were not enough to

9   prevent storm water from flowing over scrap metal, engines, crushed concrete, old TVs and

10   computers before entering the storm drain.  *Id.*  There were no other measures in place to treat the

11   excessive metal concentrations in River City's discharge.  *Id.* at 8.

12          CSPA further contends even after October 2014, the Facility remained

13   noncompliant with either the 1997 General Permit or the 2015 General Permit, because the ditch

14   and detention basin River City excavated do not qualify as BAT/BCT.  *Id.* at 9.  The ditch and

15   basin, as measured by Hagemann on June 23, 2015, do not conform to the volume requirement set

16   by the 2015 General Permit, and there was also no overflow structure, such as a standpipe or a

17   culvert for the ditch and basin, to serve as a backup impoundment structure in case of an

18   overflow.  *Id.*

19          River City points to Bryan Wilson's declaration and its own response to CSPA's

20   first set of requests for admissions, and argues it implemented "numerous and various

21   BATs/BCTs."  Opp'n 8.  In its response to CSPA's request for admissions, for example, it

22   states it placed straw wattles around certain areas, stopped accepting automobiles and waste wood

23   to reduce pollutant sources, increased housekeeping, created large berms, and implemented

24   SWPPP and training on BMP/BAT procedures.  Davis Decl. Ex. I.

25          River City's vague and conclusory answers to CSPA's requests for admission,

26   without more, are insufficient to withstand summary judgment.  *See, e.g.*, *Carter v. Clark Cty.*,

27   459 Fed. Appx. 635, 636–37 (9th Cir. 2011) (citing *Villiarimo*, 281 F.3d at 1061, and *Publ'g*

28   *Clearing House*, 103 F.3d at 1171).  Conclusory statements in Wilson's declaration, that he had

1    implemented and expanded BAT/BCT, are similarly insufficient.  *See e.g.*, Wilson Decl. ¶¶ 4, 10.

2    These statements are not supported by undisputed facts in the record.  "Conclusory statements

3    without factual support are insufficient to defeat a motion for summary judgment."  *Surrell*,

4    518 F.3d at 1103; *see also Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

5              Even if the court accepts the straw wattles did qualify as part of the Facility's

6    attempt to achieve BAT/BCT, it is undisputed the wattles were ineffective.  In November 2012,

7    staff from the Board visited the Facility.  UMF no. 46.  The only BMP the Board observed was a

8    "fiber roll," another term for a straw wattle, that the staff rated ineffective.  UMF no. 47.  The

9    Board staff noted that other than the ineffective fiber roll, "no other BMPs were observed

10   between the crush pad and the outfall area."  UMF no. 48.  In December 2014, the Board notified

11   River City of the inadequacy of its BMPs during the previous two rainy seasons and advised

12   River City that "[t]he levels of pollutants in [its] storm water samples indicate [sic] the current

13   BMPs implemented at [the Facility] are not sufficient to reduce pollutant concentrations below

14   benchmark levels."  UMF no. 49.

15             The 1997 and 2015 General Permits both require facilities to reduce or eliminate

16   pollutants associated with industrial activity in storm water discharges, and storm water

17   discharges must comply with the Basin Plan.  RJN-A-018, 019 (1997 General Permit); RJN-B-

18   007, 008, 023 (2015 General Permit).  Yet, as of December 2014, River City's efforts had not

19   reduced pollutant concentrations.  River City's BMPs were insufficient as of December 2014.

20             Finally, River City points to no undisputed fact in the record to show it

21   implemented BMPs between December 2014 and June 23, 2015.  On the latter date, it expanded

22   the ditch and the detention basin for the third time to reach a storage capacity of 4,872 cubic feet,

23   which was still less than the 6,125 cubic feet essential for the required BMP.  UMF nos. 52, 53,

24   57.  Therefore, when the 2015 General Permit, with the 85th-percentile, 24-hour storm event

25   standard, took effect on July 1, 2015, River City's BMPs had not achieved the required

26   BAT/BCT.

27             In sum, under Clean Water Act section 301, River City is required to meet the

28   applicable standards for discharge of pollutants using BMP that meets the BAT and BCT

1   standards to prevent and reduce pollutants in storm water discharges.  *See* RJN-A-010.  Yet, as of

2   December 2014, River City's BMP was inadequate and continued to discharge pollutants.

3   Despite the subsequent excavation and expansion of the ditch and detention basin, River City's

4   BMP remained ineffective and incompliant with the Basin Plan.  Accordingly, no reasonable

5   factfinder can conclude other than that River City has not implemented BMPs to achieve

6   BAT/BCT for the Facility since April 2011.

7              2.      Receiving Water Limitations

8              The court next considers River City's storm water samples.  CSPA argues analyses

9   of samples from the Facility's storm water discharges between 2012 and 2014 showed

10   concentrations of aluminum, copper, iron, lead, TSS, zinc and COD exceeded the EPA

11   benchmark values and the 1997 General Permit's Section C(2) receiving water limitations.  Mot.

12   at 10–11.  CSPA also argues the sample results are evidence that River City did not provide

13   adequate BMPs for the Facility.  *Id.* at 11.

14              River City concedes that the levels of aluminum, cooper, iron, lead, TSS, zinc and

15   COD from its storm water samples exceeded the EPA benchmark values and the 1997 General

16   Permit's Section C(2) receiving water limitations.  UMF nos. 59–109.  Specifically, samples

17   taken on March 14, 2012, April 26, 2012, October 22, 2012, April 4, 2013, and March 10, 2014

18   exceeded the CTR for copper.  UMF nos. 96–100.  Samples taken on April 26, 2012, October 22,

19   2012, April 4, 2013, and March 10, 2014 exceeded the CTR standards for aluminum and iron.

20   UMF nos. 91–94, 104–06.  Facilities with discharges containing concentrations of aluminum,

21   copper, iron, lead, TSS, zinc and COD in excess of the EPA benchmark values have not

22   implemented the BMPs to achieve the BAT/BCT as required by the 1997 General Permit.

23   *Kramer Metals*, 619 F. Supp. 2d at 925 (concentration levels in excess of EPA benchmarks are

24   evidence supporting the citizen plaintiff's contention that defendant did not have appropriate

25   BMPs to achieve BAT/BCT).  The last four samples listed here also exceeded the Basin Plan

26   water quality standards for iron, lead, and zinc.  UMF nos. 101–06, 107–09.  River City therefore

27   violated the 1997 General Permit's receiving water limitations in Section C(2) and the Clean

28

1  Water Act on all four sampling dates.[15]  *See Kramer Metals*, 619 F. Supp. 2d at 926–27.  Finally,

2  as there is no evidence in the record with respect to samples taken after July 1, 2015, the court

3  does not determine whether River City violated the receiving water limitations for the 2015

4  General Permit.  CSPA's motion for summary judgment is DENIED in so far as it is based on

5  receiving water limitations under the 2015 General Permit.  The balance of CSPA's motion with

6  respect to receiving water limitations under the 1997 General Permit is GRANTED.

7            3.        Storm Water Pollution Prevention Plans

8            Third, the court reviews River City's SWPPPs for the Facility.  The SWPPPs

9  relevant to this case are SWPPP I, prepared September 2011; SWPPP II, prepared September

10  2012; SWPPP III, prepared July 2014; and SWPPP IV, prepared June 29, 2015.  Mot. at 12; *see*

11  *also* Davis Decl. Ex. L (SWPPP I); *id.* Ex. M (SWPPP II); *id.* Ex. N (SWPPP III); *id.* Ex. O

12  (SWPPP IV).  CSPA argues these four SWPPPs did not comply with the 1997 and 2015 General

13  Permits' requirements because (1) they did not identify BAT/BCT storm water containments, (2)

14  they did not identify pollutant sources and potential pollutants in the Facility's storm water

15  discharge, (3) they did not include a compliant site map of the Facility, and (4) SWPPP I, II, and

16  III were not signed and certified.  *Id.* at 13–16.

17            River City contends it had "generally identified these matters, and in what counts,

18  took action to protect against the discharge of polluted waters."  Opp'n at 9.  River City also

19  argues its maps were compliant despite the lack of an engineer's seal, and argues it certified the

20  SWPPPs when required.  *Id.*

21            A party is strictly liable for NPDES Permit violations under the Clean Water Act;

22  and there are no exceptions for minimal violations or mistakes.  *Sierra Club v. Union Oil Co.*,

23  813 F.2d 1480, 1490-91 (9th Cir. 1987), *vacated*, 485 U.S. 1102 (1988), *reinstated and amended*,

24  853 F.2d 667 (9th Cir. 1988); *see also* 33 U.S.C. § 1311(a).

25

26            [15] On the current record, the court is unable to verify CSPA's assertion that River City
    committed seventeen violations.  Mot. at 12.  However, the inability to verify the precise number
27  of violations does not change the court's conclusion that River City violated receiving water
    limitations.  *Cf. Gwaltney*, 484 U.S. at 53.
28

1    The SWPPP must include a narrative description of the facility's industrial

2   activities, including storage areas, shipping and receiving areas, fueling areas, vehicle and

3   equipment storage and maintenance areas, material handling and processing areas, waste

4   treatment and disposal areas, and dust or particulate generating areas.  RJN-A-029-31.

5   Additionally, the SWPPP also must include a list of potential pollutant sources associated with

6   the facility's industrial activities, and potential pollutants that could be discharged.  RJN-A-031.

7   The SWPPP must include a narrative assessment of those industrial activities and pollutant

8   sources "to determine [w]hich areas of the facility are likely sources of pollutants" and "[w]hich

9   pollutants are likely to be present in storm water discharges."  RJN-A-031-32.  And finally, the

10   SWPPP must include a narrative description of the storm water BMPs to be implemented at the

11   facility for each potential pollutant and its source, identified in the site assessment phase.

12   RJN-A-032.

13    Here, the 1997 and the 2015 General Permits required the SWPPP to identify

14   pollutant sources and potential pollutants in the Facility's storm water discharge.  RJN-A-032;

15   RJN-B-029.  The identification of the potential pollutants and pollutant sources called for by the

16   General Permits' requirements is "relatively specific."  *Kramer Metals*, 619 F. Supp. 2d at 930.

17   In *Kramer Metals* the facility at issue was also a scrap metal recycling facility.  And as the court

18   in *Kramer Metals* pointed out, while the General Permits do not require the listing of every single

19   metal or material coming into the Facility, they do require more specifics than just "metals":  "at

20   the very least, those [metals] that show up in [River City's] own testing of the [F]acility[] would

21   be appropriate to list," because without specific identification of potential pollutants, it would be

22   difficult to know if the BMPs in place are effective.  *Id.*  Aluminum, copper, lead, zinc, TSS, and

23   COD all were present in River City's own analyses of its storm water samples.  Davis Decl.

24   Exs. U, V, W, X.  Yet none of these materials were mentioned in any of the four SWPPPs.  Davis

25   Decl. Ex. L at DDL007; *id.* Ex. M at DDM007; *id.* Ex. N at DDN008; *id.* Ex. O at DDO008.

26    In addition, car parts and consumer electronics are sources of pollutants at the

27   Facility, but they were never discussed in the SWPPPs; there was only a brief mention of the

28   handling of equipment used in recycling business, and the equipment's use of hydraulic fluid and

31

1  fuel.  UMF nos. 122, 125; Davis Decl. Ex. L at DDL006–008; *id.* Ex. M at DDM007–008; *id.*

2  Ex. N at DDN008–009; *id.* Ex. O at DDO007–009.  The 1997 and 2015 General Permits require

3  the SWPPP to include a description of "significant" and "industrial" materials handled and stored

4  at the site, and a description of how each material is stored, received, shipped, and handled, as

5  well as its handling frequency and quantity.  RJN-A-029; RJN-B-029.[16]  "Significant" and

6  "industrial" materials include, for example, raw materials, recyclable materials, intermediate

7  products, final products, by product, waste products, fuels, materials such as solvents, detergents,

8  plastic pellets, and finished materials such as metallic products.  RJN-A-077; RJN-B-156.  None

9  of River City's SWPPPs mentions how the car parts or the consumer electronics at the Facility

10  were processed, stored, or handled.  Davis Decl. Ex. L at DDL006–08; *id.* Ex. M at DDM007–08;

11  *id.* Ex. N at DDN008–09; *id.* Ex. O at DDO007–09.

12  　　　　　In addition to the SWPPPs' written descriptions, the 1997 and the 2015 General

13  Permits required a site map to identify the Facility's boundaries, nearby water bodies, municipal

14  storm drain inlets, and areas of industrial activity, among other things.  RJN-A-028-32; RJN-B-

15  028.  The areas of industrial activity include

16  　　　　the locations of all storage areas and storage tanks, shipping and
17  　　　　receiving areas, fueling areas, vehicle and equipment
　　　　storage/maintenance areas, material handling and processing areas,
18  　　　　waste treatment and disposal areas, dust or particulate generating
　　　　areas, cleaning and rinsing areas, and other areas of industrial
19  　　　　activity which are potential pollutant sources.

20  RJN-A-029.  The map provided with the July 2014 SWPPP III did not fulfill the list of

21  requirements in the 1997 General Permit, and River City does not point to any evidence to dispute

22  its noncompliance in this respect.  Rather, it offers only conclusory statements in an interrogatory

23  answer, saying that it "implemented SWPPP," Davis Decl., Ex. I at DDI004, and in Wilson's

24  declaration, which states that River City provided maps with every SWPPP and that "[t]hese

25  maps did identify drains, drainage areas, and discharge locations . . . , [and] the original maps

26  showed the tipping areas where materials are temporarily exposed."  Wilson Decl. ¶ 13.  The

27  _____

28  　　　　[16] The 2015 General Permit's list of industrial material is the same list as the 1997 General
Permit's significant material list.  RJN-A-029, 077; RJN-B-029, 156.

court has identified only two SWPPP maps in the record, both attached to the declaration of CSPA's counsel. *See* Davis Decl. Exs. P, Q. The map in Exhibit Q, which was submitted with SWPPP IV in 2015, does fulfill the identification requirements as noted above. But the map in Exhibit P, which was provided with SWPPP III in 2014, falls short of the requirements of the 1997 General Permit. Specifically, the 2014 map provides no delineation of areas other than a discharge/sample area, two paved areas, storage, office, space used by another tenant, and a next door business. Other than Wilson's conclusory statement that he has provided a map that fulfills the identification requirements, River City has not pointed to any evidence in the record to support Exhibit P's compliance with the 1997 General Permit. *See* Davis Decl. ¶¶ 18–19; *id.* Exs. P, Q. As noted above, "a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Pub'g Clearing House*, 104 F.3d at 1171.

River City also has not provided any SWPPP maps for years prior to 2014, although it argues in its supplemental briefing filed after hearing that Exhibit P was used for SWPPP I, II, and III. Supp. Brief at 3. However, like the statements in the Wilson declaration, merely saying that "[e]very updated SWPPP, every year, included an updated map which Mr. Wilson produced," does not make it so on summary judgment. Even if Exhibit P had been used for SWPPP I and II, it does not meet the requirements of the 1997 General Permit.

Lastly, the 1997 General Permit requires "[a]ll reports, certification, or other information required by the General Permit or requested by the Regional Water Board, State Water Board, U.S. EPA . . . [to] be signed by [the proprietor]" and certified. RJN-A-063–64. It is undisputed that SWPPP II and III were not signed or certified. Davis Decl., Ex. E at DDE012 & Ex. G at DDG007–008. Although CSPA argues SWPPP I also was not signed or certified, it does not support this argument with citations to the record. Mot. at 18.

Accordingly, the court finds as a matter of law that SWPPP I, II, III, and IV did not comply with the 1997 General Permit. As there is no evidence in the record with respect to SWPPPs for the time period after July 1, 2015, the court does not determine whether River City was in compliance with the 2015 General Permit in this respect. CSPA's motion for summary

1    judgment is DENIED in so far as it is based on SWPPP requirements for the 2015 General

2    Permit.  The balance of CSPA's motion regarding SWPPP requirements for the 1997 General

3    Permit is GRANTED.

4               4.       Monitoring and Reporting

5               Lastly, the court considers the General Permits' monitoring and reporting

6    requirements.  CSPA argues River City did not implement a site-specific monitoring and

7    reporting program to determine the effectiveness of the Facility's pollution controls.  Mot at 19.

8    These controls include monthly storm water visual observations during the wet season and

9    sampling and analysis of storm water discharges from two qualifying rain events.  *Id.*  River City

10   contends it reported observations when it rained, and if there was no report, then no rain had

11   fallen.  Opp'n at 7.

12              The 1997 General Permit required visual observations of storm water discharges

13   from one storm event per month during the wet season, October 1 to May 30.  RJN-A-040-41.  It

14   is undisputed there were no monthly visual observations of storm water discharges for February

15   2012, May 2012, November 2012, December 2012, January 2013, February 2013, March 2013

16   and May 2013.  Davis Decl. Ex. R at DDR016; *id.* Ex. S at DDS016, 018.  While visual

17   observations are "only required of storm water discharges that occur during daylight hours that

18   are preceded by at least three (3) working days without storm water discharges and that occur

19   during scheduled facility operating hours," RJN-A-041, CSPA has shown eighty-three

20   precipitation events occurred in all of these months.  Davis Decl. Ex. B at DDB039.  Although the

21   court draws all inferences in River City's favor, no reasonable jury could conclude on this record

22   that each and every precipitation event CSPA identified occurred at night and outside scheduled

23   operating hours.  Even if the precipitation events did occur at night and outside scheduled facility

24   operating hours, under the 1997 General Permit River City was required to provide

25   documentation of these circumstances in its annual report to the Board.  RJN-A-012.

26              Similarly, CSPA has shown precipitation events occurred during the 2013–2014

27   wet season.  Davis Decl. Ex. B at DDB039.  The 1997 General Permit required River City to

28   sample and analyze the first storm event of the wet season, and at least one other storm event in

34

1    the same wet season.  RJN-A-041.  It is undisputed River City sampled and analyzed only one

2    rain event during the 2013–2014 wet season.  UMF no. 140.

3            It is also undisputed there is no analysis of iron, aluminum, lead, copper, zinc, or

4    COD levels included in the Facility's 2011–2012 annual report.  Davis Decl. Ex. R at DDR009.

5    The 1997 General Permit required River City to analyze its samples for the additional metals

6    required by Table D of the 1997 General Permit based on the Facility's SIC code.  RJN-A-058.

7    Its failure to do so is in violation of the General Permit and the Clean Water Act.

8            Lastly, River City analyzed neither the storm water it sampled on April 4, 2013 for

9    chemical oil and grease, nor the COD levels in the storm water sample taken on March 10, 2014.

10   UMF no. 141; *see also* Davis Decl. Ex. E at DDE009; *id.* Ex. G at DDG005; *id.* Ex. W at

11   DDW004–05.  The 1997 General Permit required River City to analyze the samples for oil and

12   grease or organic carbon.  RJN-A-042.  COD is one additional metal required by Table D of the

13   1997 General Permit based on the Facility's SIC code.  RJN-A-058.

14           The court thus finds as a matter of law that River City did not comply with the

15   1997 General Permit's monitoring and reporting requirement between September 2011 and the

16   date of this motion.  Here again, as there is no evidence in the record with respect to whether

17   River City met the monitoring and reporting requirement for the time period after July 1, 2015,

18   the court does not make any decision with respect to River City's compliance with the 2015

19   General Permit in this regard.  CSPA's motion for summary judgment is DENIED in so far as it

20   is based on the monitoring and reporting requirements under the 2015 General Permit.  The

21   balance of CSPA's motion regarding the monitoring and reporting requirements under the 1997

22   General Permit is GRANTED.

23           E.      Number and Days of Violations

24           CSPA also requests the court calculate the number and days of violations River

25   City has committed.  Citizens can seek civil penalties in a suit brought to enjoin or otherwise

26   abate ongoing violations.  33 U.S.C. § 1365(a); *Gwaltney*, 484 U.S. at 58–59.  Civil penalties are

27   paid to the United States Treasury.  *See Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 909

28   F.2d 1350, 1354 (9th Cir. 1990).  The methodology for calculating the maximum amount of civil

1   penalties in any Clean Water Act case is to determine categories of violations; add the number of

2   daily violations in each category; total the violations for each category; and multiply this total by

3   the daily maximum civil penalty $25,000.  33 U.S.C. § 1319(d); *Hawaii's Thousand Friends v.*

4   *City and Cty. of Honolulu*, 821 F. Supp. 1368, 1395 (D. Haw. 1993).  Once the court has

5   calculated maximum civil penalties, the court may proceed to adjust downward from this

6   maximum based on statutory factors.  *Id.*

7           Here, CSPA does not request the court determine the ultimate penalty appropriate.

8   Instead, CSPA moves for summary judgment of the number and days of violations only.  The

9   court finds the record is insufficient to calculate the information CSPA requests at this time.  For

10  example, the record is unclear regarding when River City began operations.  Furthermore, CSPA

11  also has not clarified how it reached the number and days of violations in its briefing, either by

12  providing supporting citations to the record, or pointing out any supporting case law.  Therefore,

13  CSPA's motion for summary judgment of the number and days of violations is DENIED.

14  VII.    CONCLUSION

15          CSPA's motion for partial summary judgment, ECF No. 19, is GRANTED IN

16  PART and DENIED IN PART.  The Wilson supplemental declaration, ECF No. 36, and the

17  Zweig declaration, ECF No. 35, both are STRICKEN.  The parties' stipulated request to extend

18  the pretrial conference and trial schedule, ECF No. 60, is DENIED.

19          IT IS SO ORDERED.

20   DATED:  September 2, 2016.

21

22

23                                              UNITED STATES DISTRICT JUDGE

24

25

26

27

28